***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall. The appealing party has shown good grounds to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the parties hereby stipulate that plaintiff suffered a compensable injury by accident arising out of and in the course of his employment with the City of Asheville on November 7, 2000.
2. The City of Asheville is self-insured and their workers' compensation coverage is serviced by Hewitt Coleman Associates, Inc.
3. There is no question as to the misjoinder or nonjoinder of the parties.
4. Plaintiff's average weekly wage to be determined by an accurate Form 22.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, before the Deputy Commissioner, the plaintiff was 61 years old. Plaintiff completed high school as well as various courses in fire fighting and emergency medical care. Plaintiff was hired by defendant as a firefighter on August 21, 1971 and was promoted to Captain with the fire department on August 30, 1999. Plaintiff served as a Captain as of November 7, 2000.
2. On November 7, 2000, plaintiff sustained an injury by accident arising out of and during the course of his employment with defendant when he was assisting in the removal of a person trapped in an automobile following an accident. A metal pole was blocking the door of the vehicle, and as the pole was being moved, it started to fall toward plaintiff. He attempted to stop the pole from falling and experienced pain in his low back as a result.
3. Plaintiff was treated at the Memorial Mission Hospital emergency room on November 7, 2000 where x-rays were taken because the plaintiff complained of having "wrenched his back." There was no report of a right shoulder injury at that time. The emergency room physician's assessment was "twisting injury to his back" and "muscoskeletal pain to the back." The X-rays revealed "no acute bony injury" and "degenerative change involving particularly L4 and L5."
4. An MRI of the lumbar spine was performed the following day. The impression of the radiologist performing the MRI was "unremarkable MR examination of the lumbar spine."
5. On November 17, 2000, plaintiff presented to Dr. David Capiello, an orthopaedic surgeon. Dr. Capiello noted that plaintiff had been unable to work since the accident "because of severe low back pain with radiation into the right lower extremity." He diagnosed "acute lumbar strain," ordered physical therapy, and prescribed Vicoprofen.
6. Dr. Capiello treated plaintiff's low back symptoms conservatively and kept plaintiff out of work due to those low back symptoms until January 12, 2001, at which time, he allowed plaintiff to return to light duty four hours per day. At the February 12, 2001 visit, he allowed plaintiff to return to light duty on a full-time basis. At the visit on March 12, 2001, Dr. Capiello continued plaintiff on full-time light duty and ordered a second MRI.
7. The second MRI of the lumbar spine was taken on March 26, 2001 and revealed mild degeneration apparent in the L3-4 and L4-5 disks manifested by very slight desiccation on the T2 weighted images and very minimal bulges. No focal protrusion or herniation was seen nor any nerve root impingement at any level, and the MR scan of the lumbosacral spine was normal.
8. Plaintiff returned to Dr. Capiello for a final visit on April 2, 2001, at which time, Dr. Capiello reviewed the results of the MRI taken on March 26, 2001 and opined that plaintiff had a full range of motion of his back with seemingly little pain, no neurological deficit in either lower extremity, and his deep tendon reflexes are normal and equal. Nevertheless, Dr. Capiello reported that plaintiff complained that, "his constant pain persists." Dr. Capiello could not explain plaintiff's severe and chronic pain and referred him to a spine surgeon.
9. On April 17, 2001, plaintiff presented to Dr. Michael Goebel, an Orthopaedic surgeon. Dr. Goebel noted plaintiff's chief complaint as "low back pain, right lateral hip pain" and noted that plaintiff "points to his right lower lumbar region as the source of his discomfort" along with "some mild myofascial tenderness within this region." Dr. Goebel's impression was "lumbar strain," and he prescribed physical therapy for two to three times a week for four weeks, to be followed by a Functional Capacity Evaluation. Dr. Goebel continued plaintiff on light duty with a 20 pound lifting restriction, and prescribed Celebrex.
10. Plaintiff returned to Dr. Goebel on May 15, 2001, following the completion of the prescribed course of physical therapy and the Functional Capacity Evaluation, which was performed on May 11, 2001. At the May 15, 2001 visit, Dr. Goebel noted that the Functional Capacity Evaluation indicated that plaintiff is capable of "light to medium physical level" with lifting restriction of "35 pounds occasionally, 17 pounds frequently and five pounds constantly." He noted that two MRIs and additional x-rays had revealed only "minimal degeneration at the discs at L3-4 and L4-5, consistent with age." Dr. Goebel told plaintiff he could not find anything significantly wrong with his lower spine. Dr. Goebel noted that "his MRI scans essentially look normal for his age and there really is no rating according to the N.C. Workers' Comp. Guidelines. Dr. Goebel released plaintiff to return "as needed."
11. On July 8, 2002 plaintiff presented to Dr. Andrew Rudins, specialist in Physical Medicine and Rehabilitation. Plaintiff reported trouble with his right shoulder, neck and lower back since being struck by the light pole on November 7, 2000. At that time, Dr. Rubin's diagnosis included (1) "chronic cervical sprain, with ongoing restriction in motion." (2) "Lumbrosacral sprain with particular involvement of the right SI joint." (3) "Right shoulder pain, with involvement of the right AC joint and likely the right rotator cuff."
12. On September 12, 2002, plaintiff reported to Dr. Rudins that he had temporary benefits from the SI joint pain, but he continued to have SI joint pain and pain in the center of his low back. Dr. Rudins opined that plaintiff's back pain was coming from one or more discs in his back. He informed plaintiff that he had two options: one would be consider surgery; the second option would be conservative treatment of his back which would include injections, physical therapy and stronger pain medicine. Plaintiff elected conservative treatment.
13. Plaintiff returned to Dr. Rudins two weeks later. He had been attending physical therapy that resulted in some improvement in flexibility, but he had no improvement of his pain. Dr. Rudins changed his medication at that time to MS Contin, long-acting morphine. On October 25, 2002 plaintiff saw Dr. Rudins for continuing problems. He was having pain in his shoulder, as well as his back, particularly the right low back, was having stiffness in his neck, muscle spasms. He still had significant limitations functionally, in terms of standing, walking and lifting.
14. On December 6, 2002, plaintiff returned to Dr. Rudins for "follow-up and impairment rating." Plaintiff was having problems and pain in his shoulder and in his back and neck. Nevertheless, Dr. Rudins assigned a permanent partial disability rating to plaintiff. Dr. Rudins stated "the current impairment rating is related to the accident of November 7, 2000 when a pole struck him on the right interior shoulder, causing a local injury to the shoulder with myofascial pain, as well as a lumbosacral sprain." Dr. Rudins' impression at that time was "right shoulder contusion with ongoing post-traumatic myofascial pain" and "lumbosacral sprain with essentially negative imaging studies for any acute injury." At that visit on December 6, 2002, Dr. Rudins rated plaintiff with eight percent permanent partial disability of the right upper extremity, notwithstanding the fact that plaintiff was still experiencing pain in his right extremity and low back and neck.
15. By the time of his visit with Dr. Rudins on January 27, 2003, plaintiff had had an MRI of the right shoulder which revealed swelling within the rotator cuff consistent with chronic tendonitis. Dr. Rudins opined that this problem was related to plaintiff's accident of November 7, 2000 while working for the fire department. Dr. Rudins was of the further opinion at that time that plaintiff would benefit from shoulder surgery.
16. Dr. Rudins also opined that plaintiff would not do well being in a prolonged position for a long period of time, sustained sitting, considering his cervical and lumbar problems. He testified that sitting at a computer station for a full work day would result in increased pain in the cervical and lumbar regions as well as the shoulder unless he would be able to change positions frequently, at least once every thirty minutes.
17. Dr. Rudins further opined that plaintiff's age, 60 years, would be a complicating factor regarding his ability to sit in one place and become accustomed to doing something new with his hands and shoulders.
18. Dr. Rudins opined that the treatment that he administered to the plaintiff, commencing, July 8, 2002, was reasonably necessary to affect a cure of or to control his medical symptoms from the injuries plaintiff sustained on November 7, 2000 while employed with the fire department. He was also of the opinion that plaintiff would need on-going medical care and treatment to maintain plaintiff at a plateau with respect to said injuries.
19. Dr. Rudins testified further that plaintiff's impairments were permanent and that his activities should continue to be limited. Specifically, he was of the opinion that as a result of his compensable injuries, plaintiff was disabled from performing the duties of a firefighter as a result of severe back pain, neck pain and shoulder pain. Plaintiff could not return to his position as a Captain with the Fire Department due to his lifting restrictions.
20. On June 29, 2001 plaintiff presented to Dr. Sean Maloney, a specialist in Physical Medicine Rehabilitation for an IME. Plaintiff reported that in addition to his persistent back and right leg pain that he also had increased right shoulder and neck pain since his injury and difficulty sleeping.
21. Dr. Maloney testified that as a result of his examination of plaintiff and his review of plaintiff's medical records, he was able to form an assessment of his medical problems resulting from the accident at work on November 7, 2000. Dr. Maloney opined that the cervical, lumbar and right shoulder strain; the persistent severe right SI joint pain; persistent neck myofascial pain; and persistent right shoulder pain were caused by plaintiff's on the job accident of November 7, 2000. He also opined that the very mild degenerative disc disease of the lumbar spine at L3-4 and L4-5 probably pre-existed the lumbar strain, the sacroiliac strain, but may have been aggravated by it.
22. Dr. Maloney further opined that plaintiff would not be able to perform the duties of a fire fighter given the injuries and medical problems that he identified on June 29, 2001. He was also of the opinion that these injuries were permanent and that plaintiff would have difficulty performing his normal activities within the foreseeable future. Dr. Maloney stated that plaintiff's accident of November 7, 2000 aggravated and exacerbated plaintiff's degenerative disc disease and that plaintiff was not yet at maximum medical improvement.
23. On August 30, 2001, plaintiff returned to Dr. Goebel for an assessment whether he was physically capable of performing the job of Telecommunicator for defendant. Dr. Goebel reviewed a Job Analysis form regarding the Telecommunicator position and he approved the position for plaintiff on September 1, 2001.
24. Dr. Ray Sumpter, a Vocational Case Manager, reviewed the depositions of Drs. Maloney, Rudins and Goebel and interviewed the plaintiff. Dr. Sumpter opined that plaintiff would have difficulty sitting at a computer station for a prolonged period of time and that these duties would increase his pain in both the cervical and lumbar regions. Moreover, Dr. Sumpter opined that significant pain level limits an executive's ability to concentrate and stay on task. Dr. Sumpter further opined that given plaintiff's medical restrictions per Drs. Goebel, Maloney and Rudins, plaintiff would be unable to perform the duties of a fire fighter, as well as a station captain.
25. Regarding plaintiff's ability to perform the Telecommunicator job, Dr. Sumpter testified that as typist, plaintiff "hunts and pecks" and that the job description of the Telecommunicator job provided by defendant to Drs. Sumpter and Goebel omitted any mention of a typing requirement.
26. The job analysis is also incorrect in that it referred to the work shift as being eight hours long, when the testimony of record established that the work shift for dispatchers for the defendant is 12 hours long. The job analysis does state that grasping and manipulation is continuous for 5.5 to 8 hours. Dr. Sumpter opined that plaintiff could not perform this job successfully over a period of time considering his education, his age, his work experience, his limited typing ability, his physical restrictions and his pain level.
27. The job analysis submitted to Dr. Goebel and to Dr. Sumpter was incorrect in that it did not state that the telecommunicator must possess the ability to type at least 25 words per minute and it stated the hours of work as being 8 hours when the regular shift for said job is 12 hours.
28. Dr. Sumpter also testified that plaintiff's transferable skills would be limited to fire fighting with some transferable job skills in supervision. Given plaintiff's physical impairments, age, and the very competitive local job market, he was of the opinion that it would be very difficult for plaintiff to obtain employment at entry level in a new and different job setting.
29. Plaintiff has proven by the greater weight of the evidence that the telecommunicator position with the defendant was not suitable permanent employment for several reasons. First, over a period of time the wages paid would be substantially lower than those that would have been paid to plaintiff in his prior job. Second, to perform the job of a telecommunicator, plaintiff would be required to sit for prolonged periods of time and make data entries into a computer, using his injured left hand and wrist and his injured right shoulder. These duties would aggravate plaintiff's neck, shoulder, and low back injuries and increase his pain levels substantially.
30. The competent evidence the record establishes that the plaintiff could not obtain the job of telecommunicator in open competition with other potential employees because he lacks typing skills and due to his age and physical impairments, he would not be an appropriate candidate and defendant would have to make special accommodations for him to fill said position. The job is, therefore, make-work.
31. The defendant informed the plaintiff that he could not remain employed with defendant because his injuries prohibited him from being a fire fighter. The competent evidence in the record establishes that plaintiff was not offered suitable employment by the defendant. The plaintiff only considered retirement after receiving this information. The plaintiff chose retirement over accepting unsuitable employment with defendant. The plaintiff retired as of January 1, 2002.
32. The competent evidence in the record establishes that the plaintiff cannot return to his job as captain of the fire department and plaintiff cannot obtain employment in open competition with others in the local job market in and around Buncombe County, North Carolina as a result of his compensable injuries, his advanced age, his lack of transferable work skills, and his somewhat limited education.
33. The competent evidence in the record further establishes that the Telecommunicator job was not suitable for plaintiff due to his physical capacity due to the injuries he sustained on November 7, 2000, as well as his age, prior limitations and limited typing ability notwithstanding Dr. Goebel's 1% permanent impairment rating and Dr. Rudin's 8% rating, and that the plaintiff was justified in refusing to accept that job.
34. The totality of the competent evidence in the record also establishes that plaintiff has not yet reached maximum medical improvement. At plaintiff's last visit with Dr. Rudins, plaintiff continued to experience problems with his right shoulder, right low back and muscle spasms in his neck and had not had the recommended shoulder surgery. Moreover, the plaintiff has not regained his ability to earn pre-injury wages.
35. The competent evidence in the record establishes that the plaintiff sustained an injury by accident arising out of and during the course of his employment with defendant on November 7, 2000 and that as a result of this injury by accident, plaintiff has been and continues to be disabled since January 1, 2002.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The plaintiff sustained an injury by accident to his back, neck and right shoulder arising out of and in the course and scope of his employment and as a direct result of a specific traumatic incident of the work assigned on November 7, 2000. N.C. Gen. Stat. § 97-2(6).
2. As a result of the plaintiff's compensable injury, he is entitled to receive temporary total disability compensation. The parties failed to submit an accurate Form 22 to the Deputy Commissioner. Therefore the plaintiff is entitled to receive the maximum weekly compensation rate for 2000 in the amount of $588.00. Said compensation shall commence on January 1, 2002 and continue until further order of the Commission. Compensation due that has accrued shall be paid in a lump sum. The defendant shall receive an offset in the amount of $23,300.00 that was paid to the plaintiff as a bonus under the Early Retirement Incentive Program for the six-month period from January 1, 2002 to June 30, 2003. N.C. Gen. Stat. § 97-29.
3. The plaintiff is entitled to have defendant pay for all medical expenses incurred or to be incurred as a result of his injuries by accident of November 7, 2000, for so long as such examinations, evaluations and treatments may reasonably be requested to effect a cure, or give relief and will tend to lessen plaintiff's disability. N.C. Gen. Stat. §§ 97-25; 97-2(19).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney fee herein approved, defendant shall pay to plaintiff temporary total disability compensation in the amount of $588.00. Said compensation shall commence on January 1, 2002 and continue until further order of the Commission. Compensation due that has accrued shall be paid in a lump sum. The defendants shall receive an offset in the amount of $23,300.00, which was paid to the plaintiff as a bonus under the Early Retirement Incentive Program for the six-month period from January 1, 2002 to June 30, 2003.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of his compensable injury on November 7, 2000, for so long as such examinations, evaluations and treatment may be reasonably necessary to affect a cure, give relief or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of twenty-five percent (25%) of the lump sum compensation awarded plaintiff in Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be deducted from those amounts and payable directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be payable directly to plaintiff's counsel.
4. Defendant shall pay the costs.
This the ___ day of January 2005.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER